Good morning. My name is Sarah Dubina, and with my co-counsel Alicia Hancock, I represent appellant Janese Calloway. We'd like to reserve two minutes for rebuttal. I will address Mr. Calloway's request for additional discovery and judicial notice, while my co-counsel will address the merits of Mr. Calloway's claims. This is a case in which the defendants in the court denied all of Mr. Calloway's requests for discovery, and then granted summary judgment against him, saying he had insufficient evidence. The district court was wrong to grant summary judgment while my client had a valid outstanding request for additional discovery, especially since he was a pro se inmate. This court has always recognized that the filings and briefs of pro se inmates must be liberally construed, and has expressly noted that summary judgment is inappropriate when there is a request for additional discovery from a pro se inmate, unless that additional discovery would be fruitless. Now, this may spill over to the merits of it, and you can bounce this to Ms. Hancock if you wish, but what is the theory with regards to Dr. Anderson, and how would the additional discovery request that he had propounded help him in that theory? Well, with Dr. Anderson, or CMO Anderson, we are arguing that his delay in treating Mr. Calloway, that four-day delay before scheduling his... Because he wasn't the doctor who examined Mr. Calloway, correct? He did not examine Mr. Calloway, but he was in charge of scheduling all of the appointments for the prisoners, and was in charge of the medical care for all the prisoners. And he did schedule it? He did schedule it, but he also had three distinct choices to make when he was scheduling that appointment. He could schedule an emergent appointment, which meant that he needed treatment immediately, or he could schedule an urgent appointment, which meant within 24 hours, or routine, which meant within 14 days, and he chose the urgent option, meaning within 24 hours, and then did not schedule an appointment for four days. So let me back up and make sure that I understand the record here. Dr. Albander examined Mr. Calloway, and then told Dr. Anderson that he should be scheduled for, is it a de-clotting procedure? Yes, Your Honor. And Calloway agreed and put in an urgent request? Right? Dr. Anderson put in an urgent request and told the doctor that Mr. Calloway's problem would be taken care of the next morning. Right. So what did he do wrong? Well, he scheduled the appointment for four days later and did not ensure that Mr. Calloway Did he schedule? I thought another doctor, Andreasen's boss, actually scheduled, that the examining physician said send him over for de-clotting. His boss, Andreasen, said, yep, send him over, it's urgent, which meant within 24 hours, but Andreasen didn't, wasn't the scheduler. The scheduler was his boss who scheduled it for, I can't remember whether it was Thursday and he scheduled it for Monday or something like that. Yes, Your Honor. Do I got the facts right? Yes, Your Honor. So, like Judge Nguyen, it looks like there's no evidence in the file that doing it within a day was no good, and Andreasen said do it within a day? Yes, Your Honor, and she's then sent to... And that third doctor, I don't think is sued here, is he? No, Your Honor. Okay, now, so what we have is something that should be done within a day, Andreasen said do it within a day. So what did Andreasen do wrong? Well, he's in charge of the medical treatment for all of the prisoners at CMF. Right, and that's what I'm trying to understand. I'm really trying to link it back to your discovery request, because the battleground for your case is really in the lack of an opportunity to conduct further discovery, but I'm trying to get to the next question, which is how would that discovery have helped you in your theory of liability against Dr. Andreasen if he had, based on the record, acted promptly? Well, one of the things that... Unless you're challenging the premise of my question, that he acted promptly, and then you can speak to that. Well, we are challenging that, and I'll leave that for Ms. Hancock. But Mr. Callaway requested Dr. Andreasen's job duties, which would have shown that he was responsible for scheduling the appointments and following through on the treatment for the prisoners. I read that material. I think it was submitted with a request for us to take notice of it, and it didn't look to me like it did. It didn't look to me like it would help with your case against Dr. Andreasen. What in it helps you? What words and where? Well, this was the additional discovery that Mr. Callaway requested, which included... I know he asked for it. Let's assume it looks like they just jerked him around on discovery and pretended not to know what you were asking for and wouldn't give it to him. But let's say all that's right, and we take judicial notice of the prison's established procedure that's in writing. What in it helps you? Well, the items for the CSW procedure and the CMF mission statement are for our claim against Warden Veal. The additional discovery that Mr. Callaway requested that it would help with our claims against Dr. Andreasen included... What words within the additional discovery help your claim against Dr. Andreasen? Well, this would be the additional discovery that he's requesting, specifically from his past discovery requests. It looks like all that's required is that the doctor act reasonably, basically, in this situation. And he said, get the guy over there within 24 hours, and then we just come back to where we were. Well, the additional discovery that Mr. Callaway requested that would help with Dr. Andreasen came from his previous written discovery requests, which would be asking for the duties of the defendants, including Dr. Andreasen, to show that he was in charge of the medical treatment of the prisoners. And then any past claims that had been brought against Dr. Andreasen, which would help show that he had subjective knowledge that such delays would be unconstitutional. And then any medical documentation from... Let me move over to something else. What happens when you have the kidney disease that this fellow had is you die because of poisons in your blood that your kidneys don't take out unless you get dialysis. Your client actually rejected the transfer to the hospital that Dr. Andreasen's boss did schedule. And he didn't go for another week. He still didn't die. I don't think there was any evidence that anything bad happened to him. Is that right? He got dialysis. He did receive dialysis. We're not challenging the fact that he received dialysis. We're challenging the harm that he suffered on Warden Veal's side, the pain that he suffered while he was restrained. The thing that you really had that you were challenging was that he was in restraints until he defecated three times so they could see if contraband was in his excretions. That was the only harm. But it looked like he wasn't tied to the bed or bound with his arms constrained in such a way that would hurt him under the medical condition. His arms were bound to his side so he couldn't remove the contraband himself. What harm is there in that, considering the prison need to protect against contraband? Well, Mr. Callaway testified that he was in severe pain. I'm going to turn things over to Dr. Casale. I know. You wanted to focus on the discovery. Ms. Hancock, as I understand, is going to argue the summary judgment. So let's give her a chance, unless you have something that you'd like to add further to your discovery request. I don't think so. Thank you, Your Honors. Thank you very much. Good morning. Just to finish addressing Judge Nguyen's question about the discovery that could link Andreessen, Mr. Callaway also requested in his discovery to the defendants the medical documentation regarding his confinement on counterband surveillance watch. He was denied that medical documentation. And within those documents there could be additional information and discussions between Andreessen and documents about the potential harm to Mr. Callaway of delaying his treatment. But was there a delay by Dr. Andreessen? Dr. well, now I forget his name. The one who examined him and told Dr. Andreessen that he needed to be seen right away, Dr. Andreessen then agreed that it was urgent, put in an urgent request. So what did Dr. Andreessen do wrong? Dr. Andreessen, as the chief medical officer of the California Medical Facility, directed the approval and denial of the request and was responsible for making sure that medical procedures occurred on the same time frame that they needed to. And if there is additional medical documentation in Mr. Callaway's file regarding discussions perhaps between Dr. Andreessen and other doctors, it could establish that he knew that there was an additional delay that happened and it wasn't being done urgently. Because he's the CMO, although he had put in a request for urgent, there was still that delay. And he may have some knowledge or responsibility to demonstrate deliberate indifference with regard to that additional delay. Absolutely, Your Honor. And you sent discovery to try to sort that out. Yes. I got it. Thank you. To address Judge Kleinfeld's question about how Mr. Callaway was harmed by the handcuffs that he was in and in the restraints, he was restrained, according to Warden Veal's policy, in handcuffs that were attached to a waist restraint. I thought they were attached basically to his thighs, to his waist. They were attached to his waist, that's correct, with less than three inches of slack. And Mr. Callaway put into the record evidence suggesting that in similar types of surgeries, the best way to increase circulation and make sure that the graft is healing properly is to elevate the arm at all times to encourage circulation. Because his arms were attached to waist restraints with less than three inches of slack, he was unable to follow the instructions that he was given in terms of his post-op recovery. Tell me something about the pain. It looked to me like the pain was from severe constipation caused by the narcotics that were necessarily administered to do the surgery, rather than the pain having anything to do with the dialysis itself. Is that correct? You're correct, Your Honor, that there is evidence in the record to suggest that he was suffering pain from constipation. But there is also – It was severe pain. There is also evidence in the record that he was suffering pain because of the restraints. I didn't see that. It's at supplemental excerpt of record 54, which is Mr. Callaway's deposition, in which he explained to the counsel deposing him that he complained of pain caused by the restraints, and he was told that nothing could be done about that until he cleared counterband surveillance watch. It is also at supplemental excerpt of record 38, which is an intake form for Mr. Callaway at his first chemodialysis appointment since he was put in the restraints, and he complained of discomfort and pain with the chains at that point in time. Can I ask you – I do have one question going back to Dr. Andresen. I thought your theory as to what he may have done wrong was that whoever that first line treating physician was had designated this as an emergency, and that Dr. Andresen had somehow downgraded that to mere urgency. Am I wrong on that, on the facts? Our theory with Dr. Andresen is that in his own medical diagnosis, he determined that treatment was urgent and needed to be taken care of within 24 hours. And did that differ from the diagnosis or the recommendation of that first line physician? The first level doctor, I believe, Your Honor, you're correct, diagnosed it as perhaps a higher urgency than Dr. Andresen. I would like to reserve any potential time I have for rebuttal. All right, thank you. I'll give you a minute. Good morning, Honors. May it please the Court. Deputy Attorney General Scott Fidel appearing on behalf of Defendants Veal and Andresen. This is a case about an inmate who took a passive approach to prosecuting his case, both during the discovery and summary judgment phase two. I couldn't see that. It looked to me, this looked to me like lawyers jerking somebody around. Every now and then you see it in ordinary civil personal injury litigation. No matter what the question is, they don't answer it. No matter what the request for production is, they pretend to find some fault with it, and you just don't get the discovery until you file a motion to compel and for sanctions. That's exactly how the state's conduct looked. And what's worse, you're dealing with a pro se prisoner when you – we have a case on hardball litigation where we really hung up the hardballer to dry, and I'm wondering if this isn't such a case. Well, Your Honor, I do disagree with your position, and here's why. If you look at the – I looked at the discovery. Of course. In this case, I'll refer you to the joint sets of discovery. You have joint interrogatories, joint requests for permission. It's perfectly plain that the guy's entitled to his own medical record, and there's no reason not to give him his medical record. And the guy is entitled to the printed prison procedures that regulate how to deal with somebody who has this medical problem, and you didn't give him that. And I just can't understand why not. And I think they could have. I think if – in fact, the Defendant's Counsel offered to allow the inmate to reserve his discovery, actually specifying – dividing it up between defendants. I think you have to ask twice. Yes. Because some of the – The medical records. I understand that, Your Honor. I think it's because some of the requests, some of the questions that required defendants to sign under oath, one couldn't answer on behalf of the other. For example, he asked whether Andreasen knew about his particular medical condition. Ward and Veal wouldn't be able to sign under oath what Dr. Andreasen's state of mind was. No, they could have used medical records. The medical records were included in that request, Your Honor, and that is that – elevating form over substance. Because you know you're dealing with a pro se plaintiff who's limited to 20 sheets of paper a week. He had another litigation pending. And he's trying to – I agree with Judge Klineford. He's doing his best to move his litigation forward. This was about six months from the time the answer came in to the state moving for summary judgment. And during that interim, he did quite a bit for pro se litigant in attempting to move his case forward. So I don't know why the warden and Dr. Andreasen couldn't have answered his question separately. Instead, invoking this procedural thing, which I'm not quite sure is even correct, barring him from discovery and then immediately moving for summary judgment. That doesn't seem very fair. Well, and I do direct Your Honor's attention to the portion of the record where the defense counsel did offer the inmate an opportunity to reserve his request and to extend the discovery deadline to allow him to do so. Why would he have to reserve it? I mean, if an insurance defense lawyer in a routine car accident gets the medical waiver he's entitled to from the plaintiff and – well, first of all, if he asks for it, he's entitled to get it. He doesn't have to ask twice. If he asks for medical records, he's entitled to get them. He doesn't have to ask twice. But with you, he has to ask twice. Why? And I think, Your Honor, it isn't so much the focus on the joint request for production. I think it more has to do with the joint interrogatories and joint RFAs, which would be difficult for one party to respond to. I think allowing the inmate an opportunity to reserve those, dividing them up, would make a cleaner record, and it wouldn't harm the case at all because he did – the defense counsel offered to extend the discovery deadline to allow him to do so. In fact, the district court noted that. But the idea would be to extend the deadline where he's already done everything, so he should have had the stuff before the deadline instead of having to ask the judge for permission to do it later, and you wouldn't give it to him. And, again, I think that's the reason why. Regardless, as this Court has mentioned in the beginning of the argument, discovery sought really wouldn't have made a difference here. I mean, you look at, for example, plaintiffs requesting judicial notice of the contraband watch policy. That's not going to show either defendant's state of mind. The policy itself says nothing about what they knew based on prior incidents or what could have caused them to believe it would be a deficient policy or, in Andreasen's case, what would have caused him to know that the inmate had a watch. And that would have implicated Veal. Veal may not have known anything about it, but the procedures might show that he had a duty to keep control of it. Well, I think, you know, looking at the procedures themselves, the plaintiffs asking for judicial notice of, there's nothing in there. In fact, the procedures themselves allow for discretion on the part of the officers. That's actually why I asked that question about what in the procedures helps you. It would be on page 9 of Exhibit A. So you just had him chasing a rabbit around in the woods when you had these procedures that would have helped him and you wouldn't give them to him. I don't think they would have helped him, Your Honor. That's what I'm trying to say. And I'm saying let's assume that's true. Then why send him on this rabbit chase instead of giving him the procedures so he can focus his case on what matters? These procedures, they're not secret. It's not national security. No, I agree with Your Honor. I do. And I, you know, I think, and again, just let me know. And as I recall, I can't remember the details of the case. It was Judge Wardlaw and me and a third judge. And I'm just wondering why the district judge doesn't have to extend discovery and punish the State on account of the State's jerking the prisoner around on discovery. Well, I do think the State had good grounds. If you look at the plain rules of Rule 33 and Rule 34, there is interrogatories and requests for admissions are to be served by one party on another party, not on multiple parties. And the district judge found that. I saw that you rely on that. Frankly, I couldn't find any case that supports that position. So I think it's a debatable point that you took in the district court. And against the pro se, do you have a case to cite to the court now? No, Your Honor. I don't have a case directly on point. I think that neither did the district court. I think that the plain language of the rule is enough. It certainly doesn't allow for interrogatories to be served on multiple parties. It says one party may serve on any other party. On both those rules, it's very clear. And I think that that's what the Judicial Committee intended. That strikes me as more one way of jerking a pro se around. Well, as I did say, Your Honor, I think regardless, even if this is no clear authority for it, I'm just making up an excuse not to give him stuff that he's entitled to. I think that the way that the discovery was requested made it confusing. Not like Your Honor saying about the medical records, but I think that they were combined with interrogatories, NFRFAs, and kind of a big jumbled package. And it made it difficult for one party to respond to them. And that is why defendants instead offered to allow him more time to do so. Regardless, in this case, I don't think that the discovery requested would have made a difference. It's harmless error. If you look at the request for judicial notice, that information would not show either defendant's state of mind. And, indeed, I think if you look at the record. Hang on. Why do you say that about let's just focus on Veal, Warden Veal? I mean, part of the request were for prior incidents involving this same restraint policy. And if, in fact, there had been a number of other inmates who had been injured by the same exact policy and Veal had been made aware of that, why do you say that would have no bearing on his state of mind? Well, I think, and this kind of goes back to one of the arguments I raised in my brief, is the fact that, Your Honor, that specific request was not identified to the district court in a Rule 56D motion. So the district court did not know. I don't think you're going to get very far with that argument either, counsel. I look at request number one. State the duties of Veal and Andreessen. If these duties are set forth in a document, produce the document. The only fair reading of that is that it's a request for production of a document setting forth their duties. There was such a document. We've now seen it in the request to take judicial notice. And I can't and I don't see any excuse for not producing it. The only thing you've said is something that's supported by no authority, that, well, you can't ask two defendants at once. Well, I don't know any rule that says that. You gave me an interpretation, and I suppose it's a colorable interpretation of the rule that says that, but you can't cite a case that interprets the rule that way. That's correct, Your Honor. But I think it was a fair interpretation for the defendants' counsel to take. But you're not supposed to do that. That's hardball litigation. That's jerking people around in discovery, and it's inexcusable. Counsel, let me ‑‑ I'd like an answer to my question. You started out with this Rule 56D objection. Put that aside. What else do you have in response to my question on Veal? Sure, Your Honor. If you could just point me to the specific request again just so I can respond that you were ‑‑ About prior incidents involving this particular restraint policy that Veal may have been aware of. That's what he was asking. And you're saying that, oh, well, it wouldn't have any bearing on whether Veal had the right state of mind. I'm saying how can that be? Well, you know, I would think that that particular request, you know, may have some bearing. I don't know. I think, again, and this goes back to my Rule 56 argument, is that I don't think that the district judge would have known to go back, and there shouldn't be a policy to require him to go back to look for what request the inmate wanted and surmise what the defendant's responses could have been and then determine whether or not that would have defeated summary judgment. That's a Herculean task, and really this court is counseled against it in Carmen. All right. Thank you very much, Counsel. Thank you, Your Honors. Do you want your minute on the clock, or are you prepared to submit? If I could just address one thing that was raised by the government. Sure. Your Honor, thank you. I would like to address the claim made by the government that the CSW policy itself has no bearing on Warden Veal's state of mind and would like to submit that it is evidence of Warden Veal's subjective knowledge that the policy on its face was deficient and created an obvious risk of harm to Warden Veal's inmates, who he knew all had specific acute medical conditions that could have been harmed by a policy that required full-body restraints 24 hours a day with no medical exceptions and no medical oversight. What was the document you wanted us to look at that shows Veal's subjective knowledge? It's the Counterband Surveillance Watch Policy, which is at the Motion for Judicial Notice Exhibit A. And what's in it? Pretty much everything in it, Your Honor. The fact that it requires in bold that full-body... Let me even address the facts of this case. So tell me what in it particularly. The fact that it requires full-body restraints at all times, which is in bold in the policy. The fact that those restraints do not allow for more than three inches of slack. Also the fact that there is no medical oversight. There is no requirement that medical personnel check in on inmates who are in those restraints at any particular given interval of time. And the fact that there is no time limit on the Counterband Surveillance Watch. It is not limited by time. Instead, it is limited by the number of clean bowel movements that an inmate might have. Thank you, Your Honor. All right. Thank you very much. Interesting argument. And we thank you very much for your pro bono service in taking this matter. We'll be in short recess.
judges: Kleinfeld, Nguyen, Watford